## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

David Wilkerson,

   Plaintiff,

  v.

Timothy Chamberlain, Bessie
Dominguez, Susan Tuell, and Wexford
Health Sources, Inc.,

   Defendants.

No. 3:17-cv-50046

Honorable Iain D. Johnston

## MEMORANDUM OPINION AND ORDER

Plaintiff David Wilkerson[1] brings this action under 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment right to be free of cruel and unusual punishment. His claims center around the lengthy history of medical treatments that he received for his chronic pressure wounds and urological conditions while incarcerated at Dixon Correctional Center. Defendants Dr. Timothy Chamberlain, Dr. Bessie Dominguez, Susan Tuell, and Wexford Health Sources, Inc., each move for summary judgment. For the following reasons, all four motions for summary judgment are granted.

---

[1] The Court thanks Heather Benzmiller Sultanian, Leslie Kuhn-Thayer, and Andrew Rodheim for their representation of Mr. Wilkerson in this action.

## I.  Legal Standard

### A.  Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant; it does not require that the dispute be resolved conclusively in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The Court must construe the evidence and all reasonable inferences in favor of the nonmovant. *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). However, the Court need not draw every conceivable inference, only reasonable ones. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005). And "[s]peculation is insufficient to withstand summary judgment." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996). Indeed, "the nonmoving party 'must do more than simply show there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### B.  Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). Factual allegations "should not contain legal argument," and responses "may

not set forth any new facts." LR 56.1(d)(4), (e)(2). They should also be short, containing only one to two individual allegations. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). "District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994); *Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.").

## II. Background

Medical services at Dixon Correctional Center ("Dixon") are provided by Wexford Health Sources, Inc. ("Wexford"). Dkt. 327 ¶ 1. To receive offsite care from a specialist, Dixon requires that a Wexford provider request a referral. *Id.* ¶ 3. The request then goes to Dixon's medical director for review. *Id.* If the medical director approves the request, it next goes through a "collegial review process," in which Wexford corporate employees review the request to approve it, deny it, or recommend an alternate treatment plan. *Id.* ¶ 4. If the request is approved through collegial review, a site scheduler makes an appointment. *Id.* ¶ 5.

Dr. Dominguez and Dr. Chamberlain were physicians, and Ms. Tuell was a nurse practitioner; they were employed by Wexford and treated patients at Dixon. *See id.* ¶ 21; Dkt. 313 ¶ 7. Dr. Chamberlain served as Wexford's medical director at Dixon from August 2015 to May 2017. Dkt. 330 ¶ 3. Dr. Dominguez retired in September 2016. Dkt. 313 ¶ 6.

Mr. Wilkerson was transferred to Dixon Correctional Center ("Dixon") on December 22, 2014, and released in June 2023. Dkt. 308 ¶ 2; Dkt. 331 ¶ 2. He uses a wheelchair because of a gunshot wound that damaged his spinal cord. Dkt. 327 ¶ 22. He suffers from paraplegia, chronic pressure wounds, and numerous urological conditions, including neurogenic bladder and urinary incontinence. *Id.* He has had a Foley catheter since 2003. Dkt. 318 ¶ 11.

On December 23, 2014, the day after he arrived at Dixon, Mr. Wilkerson had his first appointment. Dkt. 313 ¶ 43; Dkt. 327 ¶ 23.[2] Dr. Dominguez conducted a physical, noted a pressure sore on his coccyx (the base of his spine), and changed his leaking catheter. Dkt. 313 ¶ 43; Dkt. 327 ¶ 23.

On January 15, 2015, Ms. Tuell saw Mr. Wilkerson, who reported bloating, stomach distension, swelling in his left testicle, and pus and blood in his urine. Dkt. 308 ¶ 42. She ordered a urine culture because his paraplegia made him more prone to infection, and she drafted a referral for him to see a urologist at the University of Illinois Chicago (UIC). *Id.* ¶¶ 42-43. However, the referral was canceled by another provider. *Id.* ¶ 65.

A week later, Dr. Dominguez noted a second open wound in his sacral area, this time on his left buttock. Dkt. 327 ¶ 24; Dkt. 313 ¶ 44. Mr. Wilkerson's wounds were cleaned and dressed regularly by Wexford medical staff; sometimes, they might have asked Ms. Tuell or Dr. Chamberlain to assess the wounds. *See, e.g.*, Dkt. 327 ¶¶ 24, 33; Dkt. 308 ¶ 45. By February 18, 2015, the sacral wound had begun

---

[2] His medical records are voluminous—the Rule 56.1 statements of fact mention over one hundred dates—so it would be impractical to summarize every appointment in the record.

"tunneling deeper" and had turned "beefy red." Dkt. 327 ¶ 24; Dkt. 313 ¶ 46. Dr. Dominguez was notified, and she ordered that the wound be packed with iodoform gauze. Dkt. 327 ¶ 24; Dkt. 313 ¶ 46.

On March 12, 2015, a Wexford physician documented that Mr. Wilkerson experienced bladder spasms twenty to thirty times each day. Dkt. 327 ¶ 25. His catheter had also fallen out a few times. Dkt. 341 ¶ 25. He was prescribed Ditropan, a bladder muscle relaxant. Dkt. 327 ¶ 25.

The next month, Mr. Wilkerson's pressure wound showed exposed muscle. On April 10, 2015, Dr. Dominguez identified the exposed muscle, and she wrote a referral four days later for Mr. Wilkerson to be seen at the UIC wound care clinic. *Id.* ¶ 26; Dkt. 313 ¶ 48. A week later, Mr. Wilkerson saw Dr. Dominguez again, but this time for an H. pylori infection. Dkt. 313 ¶ 49. He didn't take the antibiotics for this infection because they upset his stomach, but he also refused an alternative offered by Ms. Tuell during a follow-up appointment. Dkt. 308 ¶ 44.

Over the summer, Mr. Wilkerson's catheter continued leaking, and the urine got on his wound. Dkt. 327 ¶ 27. He also had intermittent urinary tract infections (UTIs) and blood in his urine. *Id.* At times, when his catheter came out, he had to use a towel to soak up the urine. *Id.* ¶¶ 27-28; Dkt. 341 ¶ 27. He also still had both pressure wounds, as well as stomach pain. Dkt. 327 ¶ 27; Dkt. 313 ¶¶ 50-51.

On August 4, 2015, Mr. Wilkerson saw Dr. Igor Altman, a wound care specialist at UIC. Dkt. 327 ¶ 29. He recommended changes to Mr. Wilkerson's daily dressing and wrote in his notes that UIC would see Mr. Wilkerson in four weeks or

sooner as needed. *Id.* Following the recommendation for Mr. Wilkerson's wound dressings, Dr. Chamberlain ordered that calcium alginate be used instead of iodoform gauze. Dkt. 318 ¶ 23. At the end of August, the coccyx wound had healed, and Ms. Tuell discontinued the dressings for it, though the daily dressing changes for the sacral wound continued. Dkt. 308 ¶ 45; Dkt. 331 ¶ 45.

Mr. Wilkerson also continued to have issues with his catheter, and the urine leakage around his wound caused his skin to change color. Dkt. 327 ¶¶ 32, 34. In mid-September 2015, Ms. Tuell ordered a wound culture, which showed an E. coli infection. Dkt. 308 ¶ 47. She didn't prescribe any more antibiotics because Mr. Wilkerson was already on two for the H. pylori infection. *Id.* In a follow-up appointment six days later, Ms. Tuell noted that there was no sign of infection because "the wound showed pink flesh, no purulent drainage, and no odor." *Id.* ¶ 48. At the end of that month, on September 29, 2015, Dr. Chamberlain noted that the urine leakage likely slowed the healing of the pressure wounds, and he referred Mr. Wilkerson to the UIC urology clinic. *Id.* ¶ 17; Dkt. 327 ¶ 35.

The referral was approved on October 8 through collegial review. Dkt. 327 ¶ 35. But by the new year, Mr. Wilkerson still hadn't seen a urologist, so he asked Dr. Chamberlain about it on January 7, 2016. *Id.* ¶ 36; Dkt. 308 ¶ 17. Dr. Chamberlain requested that Mr. Wilkerson be scheduled with local urologist Dr. Mathew C. Mathew at Katherine Shaw Bethea Hospital ("KSB") so that he could be seen sooner. Dkt. 327 ¶ 36; Dkt. 308 ¶ 17. Dr. Mathew saw Mr. Wilkerson on January 18, and he recommended a cystogram, a computed tomography (CT) scan

6

of the abdomen and pelvis, and Ditropan twice a day. Dkt. 327 ¶ 36; Dkt. 308 ¶ 18.
Dr. Chamberlain discussed these recommendations with Mr. Wilkerson a few days
later, and he put in a referral for Mr. Wilkerson to return to Dr. Mathew after the
cystogram and CT scan. Dkt. 308 ¶¶ 19-20.

Mr. Wilkerson's medical issues continued. His records show that the wound,
which still caused him pain, was "beefy red" with "thick yellow drainage" and
emitted an odor. Dkt. 327 ¶ 37. Wexford medical providers continued dressing
changes as previously ordered but notified Dr. Chamberlain of the odor. *Id.* Mr.
Wilkerson also reported increasing urinary symptoms and blood in his urine. *Id.*

The cystogram and CT scan took place on February 29, 2016. Dkt. 308 ¶ 20.
On March 3, Mr. Wilkerson went back to Dr. Mathew, who recommended a referral
to the UIC wound care clinic. Dkt. 327 ¶ 38. On May 17, Mr. Wilkerson returned to
Dr. Altman, who referred him to the UIC urology clinic. *Id.* ¶ 40. Dr. Chamberlain
approved the urology referral on May 25, 2016. *Id.* ¶ 41.

By October 2016, Mr. Wilkerson still hadn't been seen at the UIC urology
clinic. He saw Ms. Tuell for unrelated reasons on October 13, 2016, during which he
also asked about the outstanding urology referral. Dkt. 308 ¶ 52. Ms. Tuell said she
would check for him, and six days later, on October 19, 2016, Mr. Wilkerson finally
saw a urologist at UIC. *Id.* ¶¶ 22, 52; Dkt. 327 ¶ 42. The urologist discussed options
for catheterization and requested that Mr. Wilkerson return for a cystoscopy. Dkt.
327 ¶ 42. Dr. Chamberlain saw Mr. Wilkerson five days later, and Mr. Wilkerson
reported "bladder spasms up to three times per day, with blood clots in his urine

tubing." *Id.* ¶ 43. Dr. Chamberlain noted a possible UTI and that Mr. Wilkerson would follow up with UIC soon. *Id.* Two days later, on October 26, Dr. Chamberlain approved the UIC urology clinic's recommendation for a follow up; Wexford approved it through its collegial review process on November 10, 2016. *Id.* ¶ 42.

On November 23, 2016, Mr. Wilkerson underwent an ultrasound for his kidneys and bladder. Dkt. 308 ¶ 53. Ms. Tuell reviewed the ultrasound on December 7; during that appointment, she also told Mr. Wilkerson that he had been approved for the follow up with the UIC urology clinic. *Id.* His bladder spasms continued, increasing at the beginning of 2017. Dkt. 327 ¶¶ 43-44. Dr. Chamberlain also noted a possible UTI on March 28, 2017. *Id.* ¶ 44.

On April 5, 2017, Mr. Wilkerson went to UIC for the cystoscopy, but it was canceled because he had a UTI "with insufficient antibiotic treatment." *Id.* ¶ 45. UIC also noted that it hadn't received an ultrasound report from Wexford. *Id.* Six days later, on April 11, a Wexford physician signed another referral for Mr. Wilkerson and signed off on sending the ultrasound report. Dkt. 308 ¶ 41. UIC received the report the next day, but the UIC urology clinic never received it. *Id.* ¶ 41; Dkt. 318 ¶ 29; Dkt. 327 ¶ 47; Dkt. 331 ¶ 41.

Mr. Wilkerson returned to the UIC urology clinic on May 24, 2017, and Dr. Michael Abern performed a cystoscopy. Dkt. 327 ¶ 45. Dr. Abern recommended the insertion of a suprapubic catheter (which differs from a Foley catheter in that it drains through the lower abdomen instead of the penis). *Id.* On June 1, 2017, Mr. Wilkerson underwent surgery for the suprapubic tube. *Id.* ¶ 47. For weeks after the

surgery, Mr. Wilkerson stayed at the hospital. *Id.* He developed large fluid collections in his pelvis and was diagnosed with an infected pelvic hematoma. *Id.*

On June 7, 2017, Dr. Altman saw Mr. Wilkerson and noted that the left buttock wound persisted, ordering a follow up within two to three weeks after Mr. Wilkerson was discharged. *Id.* Throughout June and July, Ms. Tuell visited Mr. Wilkerson at the hospital. Dkt. 308 ¶¶ 56-58. Mr. Wilkerson experienced abdominal pain, blood in his urine, and leakage from the catheter. Dkt. 327 ¶ 48.

On July 5, 2017, Mr. Wilkerson had his suprapubic tube changed at UIC. *Id.*; Dkt. 341 ¶ 48. When Ms. Tuell visited Mr. Wilkerson on July 17, 2017, she noted that Mr. Wilkerson's urine was clear but the drainage from the catheter was bloody and cloudy. Dkt. 308 ¶ 58. Because of the difference between the urine and the catheter drainage, Ms. Tuell became concerned about the placement of the suprapubic tube, so she contacted UIC to schedule an appointment for Mr. Wilkerson. *Id.* ¶ 59. On July 26, 2017, a UIC urologist evaluated Mr. Wilkerson and ordered a CT scan and ultrasound. Dkt. 327 ¶ 49. The CT scan, which took place on September 21, showed that the suprapubic catheter inserted on July 5, 2017, had been misplaced: rather than going into Mr. Wilkerson's bladder, it went next to the bladder in the left side of the pelvis. *Id.*

In a follow-up appointment on September 27, 2017, the misplaced tube was removed. *Id.* ¶ 51. The urologists at UIC also prescribed something else for Mr. Wilkerson's bladder spasms and referred him for Botox injections. *Id.* Mr. Wilkerson received Botox injections throughout 2018, and UIC changed his prescription again

in April 2018. *Id.* ¶ 52. With the combination of Botox and the new prescription, Mr.

Wilkerson's bladder spasms improved and became manageable. *Id.*

## III.  Analysis

Through its prohibition of "cruel and unusual punishments," the Eighth

Amendment imposes duties on prison officials to ensure, among other things,

adequate medical care for incarcerated individuals. *Farmer v. Brennan*, 511 U.S.

825, 832 (1994). But not every injury "translates into constitutional liability." *Id.* at

834. To violate the Eighth Amendment, a prison official must act with deliberate

indifference. *Id.*; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To make a claim of

deliberate indifference, a plaintiff must show (1) an objectively serious medical need

(2) to which the defendant was deliberately indifferent. *Farmer*, 511 U.S. at 834,

847; *see also Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022). In

addition, the plaintiff must show that the deliberate indifference injured the

plaintiff. *Stockton*, 44 F.4th at 614.

The parties don't dispute that Mr. Wilkerson had objectively serious medical

conditions, so the Court assumes that his paraplegia, chronic pressure wounds, and

urological conditions qualify as such. *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir.

2014). The remaining questions are whether each defendant acted with deliberate

indifference and whether this deliberate indifference caused harm to Mr. Wilkerson.

### A.  Individual Defendants

"Deliberate indifference requires a look into the subjective state of the

defendant['s] mind." *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022). To

have a "sufficiently culpable state of mind," the defendant must be subjectively

10

aware of the specific, serious medical need or risk and must disregard it by "failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 834, 847; *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). The defendant must know of the facts from which the risk can be inferred, and the defendant must draw that inference. *Farmer*, 511 U.S. at 837. "Mere negligence or even civil objective recklessness simply is not enough." *Brown*, 38 F.4th at 550 (citing *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)) (cleaned up). Nor does medical malpractice constitute deliberate indifference. *Estelle*, 429 U.S. at 106. Under the Eighth Amendment, an individual is not entitled any "specific care" or the "best care possible," *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997), but only "adequate, minimum-level medical care." *Johnson*, 433 F.3d at 1013. Deliberate indifference is a demanding standard "because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

When a medical professional claims that the treatment rendered issued from their medical judgment, that claim is owed deference as an assertion that they lacked a culpable mental state. *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). Deference to a claim of medical judgment may be overcome by evidence—direct or circumstantial—that the medical professional did not honestly believe their own explanation, including by their persistence in a course of treatment known to be ineffective, or by a departure from the standard of care so radical that one may infer

that they did not exercise professional judgment at all. *Id.*; *Thomas v. Martija*, 991 F.3d 763, 768 (7th Cir. 2021).

Because direct evidence to prove deliberate indifference is rare, the Seventh Circuit has identified several circumstances that allow a reasonable inference of deliberate indifference. *Brown*, 38 F.4th at 550; *Petties*, 836 F.3d at 728-29. Mr. Wilkerson argues that three such circumstances are present in this case: a delay of medical care, continued ineffective treatment, and a substantial departure from accepted professional judgment, practice, or standards. Dkt. 328 at 13; *see Brown*, 38 F.4th at 550. For the substantial departure from accepted standards, Mr. Wilkerson specifically argues that there was deliberate indifference because Defendants refused to follow the advice of specialists. Dkt. 328 at 13; *see Petties*, 836 F.3d at 729. Defendants generally argue that Dr. Dominguez, Ms. Tuell, and Dr. Chamberlain were attentive and caring toward Mr. Wilkerson's medical needs.

Although the parties combine their arguments as to Dr. Dominguez, Ms. Tuell, and Dr. Chamberlain, liability under § 1983 is individual, and each defendant's actions must be examined separately. *See Petties*, 836 F.3d at 728; *see also Greyer v. Allen*, No. 20-cv-50014, 2023 U.S. Dist. LEXIS 186102, at *19 (N.D. Ill. Oct. 17, 2023). For each defendant, in asking whether the defendant had actual knowledge of the risk to Mr. Wilkerson's health, the Court must look only at what the individual knew, not what the collective Wexford staff might have known. *See Whiting v. Marathon Cnty. Sheriff's Dep't*, 382 F.3d 700, 704 (7th Cir. 2004) ("*Farmer*, since it requires the defendant-official to have actual knowledge of the

risk, foreclosed imputed knowledge as the basis for an Eighth Amendment claim of deliberate indifference.").

Mr. Wilkerson organizes his arguments into time periods delineated by important appointments, referrals, and procedures and separated by the condition being treated, namely his pressure wounds and his urological conditions. In its analysis for each defendant, the Court follows that pattern of organization.

1. *Dr. Dominguez*

a. *Pressure wounds*

Mr. Wilkerson argues that the months of daily dressing changes without any referral to the UIC wound care clinic was persistence in an ineffective course of care. Dkt. 328 at 14. Although Dr. Dominguez didn't refer Mr. Wilkerson to UIC until April 2015, the facts don't show that Dr. Dominguez was inattentive to Mr. Wilkerson's concerns in the meantime. During his first appointment with her, she noted the first pressure wound and changed his leaking catheter. Dkt. 327 ¶ 23; Dkt. 313 ¶ 43. During the next appointment, nearly a month later, Dr. Dominguez identified a second open wound and "likely" ordered dressing for this new wound. Dkt. 327 ¶ 24; Dkt. 313 ¶ 44. Less than a month later, when a nurse notified Dr. Dominguez that the wound was "beefy red" and "tunneling deeper," Dr. Dominguez recommended packing the wound with iodoform gauze. Dkt. 327 ¶ 24; Dkt. 313 ¶ 46. The idea was that the gauze would irritate the sides of the wound and make it

granulate. Dkt. 313 ¶ 46.[3] This change in treatment was in response to the nonhealing wound; even though Dr. Altman later discontinued the iodoform dressing, that doesn't mean Dr. Dominguez was deliberately indifferent—she wasn't constitutionally required to administer some specific treatment. *See Forbes*, 112 F.3d at 267. After the next appointment where Dr. Dominguez examined the nonhealing wound and identified exposed muscle, she referred Mr. Wilkerson to UIC. Dkt. 313 ¶ 48; Dkt. 327 ¶ 26.[4] She testified that this was because she had become familiar with Mr. Wilkerson after being "called a few times while he was having his dressing changed," and realizing it might be worth seeing if UIC had more suggestions. Dkt. 332 ¶ 48.

Mr. Wilkerson contends that this three-month delay between the initial physical and Dr. Dominguez's referral was inexcusable. Dkt. 328 at 14. But the choice to refer Mr. Wilkerson to UIC involved an exercise of medical discretion, and there's nothing in the record to suggest that Dr. Dominguez knew and ignored a need for a UIC referral. *Cf. Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) (finding a genuine dispute because the director of a medical unit claimed to have no idea what "referral for urology work-up" meant). Dr. Crisostomo, one of Mr. Wilkerson's experts, opined that Mr. Wilkerson should have been referred after his wound was present for more than three to four weeks and that this was a breach of

---

[3] "Granulation" is "[t]he formation of minute, rounded, fleshy connective tissue projections on the surface of a wound, ulcer, or inflamed tissue surface in the process of healing." *Stedman's Medical Dictionary* 830 (Lippincott Williams & Wilkins 28th ed. 2006).
[4] During the other two appointments up to this point, there's no indication that Mr. Wilkerson's pressure wounds were brought up; those appointments were for Mr. Wilkerson's high blood pressure. Dkt. 313 ¶¶ 45, 47.

14

the standard of care. But expert opinions are only "weakly probative" of a doctor's mental state. *Zaya*, 836 F.3d at 807. Dr. Crisostomo also follows Mr. Wilkerson's lead in talking about Defendants collectively rather than analyzing individual actions—on the individual physicians, Dr. Crisostomo notes that "none of [them] saw Mr. Wilkerson with sufficient frequency to be intimately aware of his wound care progression." Dkt. 326-20 at 9. It may have been unreasonable to wait until her fourth appointment related to Mr. Wilkerson's pressure wounds to refer him to UIC, but it's not such a "radical" departure from the standard of care that it creates a genuine dispute as to Dr. Dominguez's state of mind.

Mr. Wilkerson next argues that, after her referral, Dr. Dominguez "allowed" a four-month delay before Mr. Wilkerson was seen at the UIC wound care clinic. Dkt. 328 at 14. But nothing in the record suggests that, between April and August 2015, Dr. Dominguez knew Mr. Wilkerson had yet to go to the UIC wound care clinic. Mr. Wilkerson asserts two facts: that Dr. Dominguez knew Mr. Wilkerson needed specialist care and that his medical records noted no improvement. *Id.* at 16. Dr. Dominguez knew Mr. Wilkerson needed specialist care, so she put in the referral, but that doesn't mean that she knew there were delays in getting Mr. Wilkerson an appointment. And Mr. Wilkerson's quote from his medical records indicating that there was no improvement comes from Dr. Chamberlain. *See* Dkt. 327 ¶ 24; Dkt. 327-2 at 13. There are also no appointments during this period where Mr. Wilkerson is recorded having asked Dr. Dominguez about the referral—the only two appointments with Dr. Dominguez were for Mr. Wilkerson's stomach pain. *See* Dkt.

313 ¶¶ 50-51. Even if Dr. Dominguez *could* have done something to speed up the process, there's no evidence that she was aware of this delay to be able to do something about it, so she lacked the subjective state of mind required for deliberate indifference. *See Farmer*, 511 U.S. at 847; *Johnson*, 433 F.3d at 1010.

Next, Mr. Wilkerson argues that Dr. Dominguez was deliberately indifferent because she ignored Dr. Altman's order to have Mr. Wilkerson back at the UIC wound care clinic in four weeks (or sooner as needed). Dkt. 328 at 17. But for this part of Mr. Wilkerson's argument, he never mentions Dr. Dominguez individually— just Ms. Tuell and Dr. Chamberlain. *See id.* at 18-19. And for the period between Mr. Wilkerson's appointment with Dr. Altman on August 4, 2015, and the next referral on March 9, 2016, there are no mentions of Dr. Dominguez in the facts. No reasonable jury could find that Dr. Dominguez knew Mr. Wilkerson was overdue for a trip back to the UIC wound care clinic. Similarly, Dr. Dominguez couldn't have known that Mr. Wilkerson waited months for an appointment after the March 2016 referral because she didn't see Mr. Wilkerson until a week after his second appointment with Dr. Altman. *See* Dkt. 313 ¶ 52.

By the same token, the facts also don't show that Dr. Dominguez knew during this time that Dr. Altman had recommended "consulting with the dedicated pain service for further management." Dkt. 327 ¶ 29. She didn't see Mr. Wilkerson until May 24, 2016, after he had his follow-up appointment with Dr. Altman on May 17. *Id.* ¶ 40; Dkt. 313 ¶ 52. Mr. Wilkerson reported to Dr. Dominguez that he saw Dr. Altman, and Dr. Dominguez recommended a collegial review for the pressure

wound. Dkt. 313 ¶ 52. If she had looked at Dr. Altman's notes from May 17, she wouldn't have seen any recommendation for a pain management service because Dr. Altman made no such recommendation this time. *See* Dkt. 327-2 at 69-70. (Contrast that with the fact that Dr. Altman did recommend a urology referral. *Id.*; Dkt. 327 ¶ 40.) Whether Dr. Dominguez should have looked back further in Mr. Wilkerson's medical record goes to the question of negligence, but that is not the standard for deliberate indifference.

Mr. Wilkerson's appointment with Dr. Dominguez on May 24, 2016, was the last time she saw him before retiring. She didn't know that he wasn't receiving consistent care from a wound specialist after May 2016, so she also can't have been deliberately indifferent toward the irregularity of Mr. Wilkerson's appointments with Dr. Altman throughout the rest of 2016 and 2017.

> b. *Urological conditions*

Mr. Wilkerson makes similar arguments related to the care he received for his urological conditions. First, he argues that the nine months it took for the first urology referral shows deliberate indifference. Dkt. 328 at 22-23. The facts show that Dr. Dominguez had three appointments with Mr. Wilkerson related to his urological conditions before Dr. Chamberlain put in a referral on September 29, 2015: the initial physical on December 23, 2014, during which she changed his leaking catheter, and two appointments in summer 2015 to address Mr. Wilkerson's stomach pain. Dkt. 313 ¶¶ 43, 50-51; Dkt. 327 ¶ 23. During the latter two appointments, Mr. Wilkerson's leaking catheter wasn't a documented topic. Instead, Dr. Dominguez reviewed Mr. Wilkerson's medical chart to find a gallbladder

ultrasound that showed a stone, and she prescribed an antibiotic and a proton pump inhibitor to address Mr. Wilkerson's UTI and stomach pain. Dkt. 313 ¶¶ 43, 50-51. In all of these interactions with Mr. Wilkerson, the facts show that Dr. Dominguez was attentive to his concerns, and there is nothing to support that there was a need for a urology referral that she would've been aware of.

Mr. Wilkerson also argues that Dr. Dominguez "allowed" months to go by after the referral was made before he saw a urologist. Dkt. 328 at 23-24. Between Dr. Chamberlain's referral in September 2015 and the appointment with Dr. Mathew in January 2016, there's nothing in the record showing that Dr. Dominguez saw Mr. Wilkerson or would have had any reason to know that he was waiting for an appointment at UIC. The facts do not show that Dr. Dominguez had the requisite state of mind for deliberate indifference.

The next alleged delay is how long it took for Mr. Wilkerson to have a second appointment with a urologist, the referral for which Dr. Mathew and Dr. Chamberlain made on May 17, 2016. Dkt. 327 ¶¶ 40-41. The record shows no appointments with Dr. Dominguez before then (and after January 2016). She did see Mr. Wilkerson seven days after the referral was made, and she noted the existing urology referral. Dkt. 313 ¶ 52. However, although she was aware that he was waiting on a referral, it was a mere week after the referral, and Mr. Wilkerson acknowledges that "the wait time for a urological consultation ranges from days to weeks." Dkt. 328 at 24. No reasonable jury could find that Dr. Dominguez acted with deliberate indifference.

2. *Ms. Tuell*

a. *Pressure wounds*

Mr. Wilkerson first argues that Ms. Tuell should have referred Mr. Wilkerson to the UIC wound care earlier, rather than only continue his wound dressings. *Id.* at 15. Before Dr. Dominguez made the referral on April 14, 2015, Ms. Tuell saw Mr. Wilkerson twice. *See* Dkt. 308 ¶¶ 42-43; Dkt. 327 ¶ 24. Only the second time related to Mr. Wilkerson's pressure wounds, during which Ms. Tuell was shown Mr. Wilkerson's wounds and chose to continue his wound dressings as ordered. Dkt. 327 ¶ 24. This was on February 3, 2015, about a month and a half after Mr. Wilkerson had arrived at Dixon and two weeks after Dr. Dominguez had ordered dressing and cleaning for the sacral wound. Perhaps it was negligent of Ms. Tuell to not draft a referral at this point, but the record doesn't show that Ms. Tuell knew how long the coccyx wound had persisted, and the sacral wound was still relatively new. It would be unreasonable to conclude that this was a "radical" departure from the standard of care, even considering Dr. Crisostomo's recommendation that Mr. Wilkerson should have been referred after three to four weeks.

Mr. Wilkerson then argues that Ms. Tuell stood by for four additional months while no appointment with a UIC wound specialist was made. Dkt. 328 at 16. Ms. Tuell saw Mr. Wilkerson only once during this period, and it was for his H. pylori infection, not for the pressure wounds. Dkt. 308 ¶ 44. Nothing in the record indicates that Ms. Tuell was aware of the outstanding referral, so she cannot have been deliberately indifferent in this instance. *See Farmer*, 511 U.S. at 847; *Johnson*, 433 F.3d at 1010.

19

Next, Mr. Wilkerson argues that Ms. Tuell ignored Dr. Altman's order for Mr. Wilkerson to return in four weeks. Dkt. 328 at 17-19. Dr. Chamberlain referred Mr. Wilkerson on March 9, 2016; between the first UIC appointment and the second referral, Ms. Tuell saw Mr. Wilkerson four times. Although Ms. Tuell didn't draft a referral, the facts show that she did take action to address Mr. Wilkerson's wounds. On August 28, 2015, less than four weeks after the first UIC appointment, Ms. Tuell determined that the spinal wound no longer needed dressing but continued the daily dressing for the buttocks wounds. Dkt. 308 ¶ 45; Dkt. 331 ¶ 45. As for Mr. Wilkerson's contention that Ms. Tuell did nothing more than dressing changes when his wound had a "strong foul odor" and emitted "yellow to green thick drainage," Dkt. 328 at 18, although Ms. Tuell didn't draft a referral, she didn't ignore Mr. Wilkerson's condition either. On September 11, 2015, Ms. Tuell ordered a wound culture. Dkt. 308 ¶ 46. After the wound culture preliminary report showed E. coli, Ms. Tuell didn't prescribe another antibiotic because Mr. Wilkerson was already on two for his H. pylori infection, but she planned to monitor the wound. *Id.* ¶ 47. And then on September 22, 2015, Ms. Tuell found no sign of infection in the wound. *Id.* ¶ 48. The facts don't show that Ms. Tuell consciously disregarded a known risk. *See Zaya*, 836 F.3d at 807.

Mr. Wilkerson also argues that Ms. Tuell failed to refer him to a pain management service, per Dr. Altman's recommendation. Dkt. 328 at 19. But the facts don't show that Ms. Tuell ignored Mr. Wilkerson's pain. For example, she prescribed Ultram for his back pain on September 22, 2015, and then increased the

20

dosage on March 25, 2016. Dkt. 308 ¶¶ 48-49. The Eighth Amendment also doesn't require doctors to keep patients free of pain. *Arce v. Wexford Health Sources Inc.*, 75 F.4th 680, 681 (7th Cir. 2023) ("[T]he Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain-free." (citations omitted)); *see also Forbes*, 112 F.3d at 267. Merely departing from Dr. Altman's recommendation isn't enough to show a conscious disregard for Mr. Wilkerson, especially when viewed with other instances where Ms. Tuell was attentive to his pain. *See Zaya*, 836 F.3d at 807.

Mr. Wilkerson's argument regarding the pain management service also fails to acknowledge that pain itself is not enough for deliberate indifference. He cites to authority supporting that unnecessary pain can be an injury caused by a delay in medical treatment or by persisting in ineffective treatment, but the argument that Ms. Tuell denied Mr. Wilkerson care by not referring him to a pain management service suggests that Ms. Tuell could have been deliberately indifferent because she caused some amount of "needless pain"—a notion that the Seventh Circuit has expressed skepticism toward. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("We are not sure what exactly 'a risk of needless pain' is, or even if such a notion applies to Eighth Amendment deliberate indifference claims . . . .").

Mr. Wilkerson also contends that the months between Dr. Chamberlain's referral in March and the actual appointment on May 17, 2016, shows another unacceptable delay. Dkt. 328 at 19. During this period of time, Ms. Tuell saw Mr.

Wilkerson only once, on March 25, 2016, to follow up on his hypertension. Dkt. 308 ¶ 49. There is nothing in the record to show that Mr. Wilkerson's wound came up during this appointment, and so it would be unreasonable to conclude that Ms. Tuell had the requisite mindset for deliberate indifference.

Finally, Mr. Wilkerson argues that Ms. Tuell did nothing to ensure consistent appointments with a wound specialist. Dkt. 328 at 20. Between the 2016 and 2017 UIC appointments, the record contains seven interactions between Ms. Tuell and Mr. Wilkerson. These appointments were for Mr. Wilkerson's swollen leg, hypertension, wheelchair cushion, high blood pressure, and urological conditions— there is no indication that Mr. Wilkerson's pressure wounds were brought up. Dkt. 308 ¶¶ 50-55; Dkt. 327 ¶ 44. Contrast this with the appointment on October 13, 2016, during which Mr. Wilkerson asked about the urology appointment he was waiting on, even though the appointment was for something else. Dkt. 308 ¶ 52. No reasonable jury could find that Ms. Tuell was deliberately indifferent to Mr. Wilkerson's need for an appointment with Dr. Altman during this period because the record does not show that she was aware of the need. *See Farmer*, 511 U.S. at 847; *Johnson*, 433 F.3d at 1010.

    b.  *Urological conditions*

Mr. Wilkerson first argues that the nine months it took for the first referral shows deliberate indifference. Dkt. 328 at 22. But Ms. Tuell drafted a urology referral on January 15, 2015, the first appointment that Mr. Wilkerson had with her. Dkt. 308 ¶¶ 42-43. Although someone else later canceled the referral, that

22

doesn't bear on Ms. Tuell's subjective state of mind. No reasonable jury could find that Ms. Tuell delayed in referring Mr. Wilkerson.

The referral came on September 29, 2015, but Mr. Wilkerson didn't see a urologist until January 7, 2016—a delay that he argues Ms. Tuell was deliberately indifferent in allowing. Dkt. 328 at 23-24. But the record doesn't show that Ms. Tuell would have known that Mr. Wilkerson was waiting during this period; she saw him on September 22, 2015, and then on March 25, 2016. Dkt. 308 ¶¶ 48-49.

That appointment on March 25, 2016, was the only one with Ms. Tuell between the urologist appointment in March 2016 and the May 2016 referral for a second urologist appointment. The March 25 appointment was a follow up for Mr. Wilkerson's hypertension, so similar to before, the record does not show that Ms. Tuell would have known about the need for another urology referral. *Id.* ¶ 49. As for the five months after the referral was made but before Mr. Wilkerson saw a urologist, Mr. Wilkerson's argument focuses only on Dr. Chamberlain's actions. *See* Dkt. 328 at 24-25. What he omits is that when he saw Ms. Tuell on October 13, 2016, he asked about the urology visit, Ms. Tuell responded that she would check, and he was seen at UIC six days later. Dkt. 308 ¶¶ 22, 52; Dkt. 327 ¶ 42. No reasonable jury could find deliberate indifference in her actions.

Finally, Mr. Wilkerson argues that Ms. Tuell delayed in getting Mr. Wilkerson the ultrasound and cystoscopy that the UIC urologist requested. He says that he "had to repeatedly ask Wexford staff" about scheduling the follow up at UIC, Dkt. 328 at 25, but of the two instances presented in the facts, only one pertains to

23

Ms. Tuell. On March 8, 2017, Mr. Wilkerson requested to see Dr. Chamberlain "about outside visits in regard to his urination & multiple other issues." Dkt. 327-2 at 97; Dkt. 308 ¶ 55; Dkt. 327 ¶ 44. Responding to his request, Ms. Tuell referred Mr. Wilkerson to Dr. Chamberlain. Dkt. 308 ¶ 55. This doesn't show a reckless disregard for Mr. Wilkerson's health.

Mr. Wilkerson closes out this part of his argument by discussing how, after years of trying, he finally found a treatment plan that allowed him to manage his symptoms. But he doesn't tie any of this back to Ms. Tuell's subjective state of mind. The record also doesn't show that Ms. Tuell deliberately ignored risks to Mr. Wilkerson's health; it shows the opposite. She visited him in the infirmary four times, and she was the one who voiced the concern that the suprapubic tube had been incorrectly placed after observing the bloody, cloudy drainage despite Mr. Wilkerson's clear urine. *Id.* ¶¶ 56-58. She then contacted UIC and pushed for a sooner visit because of her concern. *Id.* ¶ 59. No reasonable jury could find that Ms. Tuell acted with deliberate indifference.

    3. *Dr. Chamberlain*

        a. *Pressure wounds*

For Dr. Chamberlain, Mr. Wilkerson first argues that Dr. Chamberlain acted with deliberate indifference when ignoring Dr. Altman's August 2015 order for Mr. Wilkerson to return to the UIC wound care clinic within four weeks (or sooner as needed). Dkt. 328 at 17-18. It wasn't until March 9, 2016, that Dr. Chamberlain referred Mr. Wilkerson. During those seven months in between the appointment and referral, Dr. Chamberlain saw Mr. Wilkerson several times, though the record

24

does not contain any detail for about half of these appointments. *See* Dkt. 318 ¶ 52. For the appointments that took place over a month after the initial appointment with Dr. Altman, the facts show that Mr. Wilkerson's urine leakage and other urological issues were the focus. Dr. Chamberlain determined that the urine was likely slowing the healing of the pressure wounds, so he referred Mr. Wilkerson to the UIC urology clinic. Dkt. 327 ¶ 35; Dkt. 308 ¶ 17.

Although Dr. Chamberlain checked the wound throughout August 2015-March 2016, the failure to schedule a follow-up with Dr. Altman doesn't create a genuine dispute. Dr. Chamberlain was responsive in how the urine leakage was affecting the wound's healing. There's also no evidence that Dr. Chamberlain was informed of specific risks associated with delaying a follow-up to Dr. Altman. *See Zaya*, 836 F.3d at 807 (finding that disagreement with a treatment decision *accompanied by* evidence that the doctor was "fully apprised of the risks associated with delaying treatment" created a genuine dispute as to a doctor's mental state). Dr. Chamberlain also did follow Dr. Altman's recommendation to use calcium alginate instead of iodoform for Mr. Wilkerson's daily dressings and to get a new Roho cushion for his wheelchair. Dkt. 341 ¶ 29. As for Dr. Altman's note to refer Mr. Wilkerson to a pain management service, the earlier reasoning for why this doesn't amount to a deliberate indifference claim also applies here. Dr. Chamberlain may have been negligent about the follow-up appointment, but his actions don't show a reckless disregard for Mr. Wilkerson's health.

Mr. Wilkerson then argues that Dr. Chamberlain shouldn't have "allowed" two months to pass after the referral before Mr. Wilkerson could see Dr. Altman. Based on the record, there's an entry in Mr. Wilkerson's medical chart from Dr. Chamberlain on March 17, 2016, but none of the statements of fact provided any detail as to what that could be about. Dkt. 318 ¶ 52. Otherwise, there is no indication that Mr. Wilkerson saw Dr. Chamberlain during the two months he was waiting for his UIC wound care clinic appointment, so there is no evidence to conclude that Dr. Chamberlain was aware that Mr. Wilkerson was still waiting. Without that awareness, Dr. Chamberlain could not have been deliberately indifferent. *See Farmer*, 511 U.S. at 847; *Johnson*, 433 F.3d at 1010.

As for Mr. Wilkerson's argument that Dr. Chamberlain did nothing to ensure that Mr. Wilkerson received consistent wound care after the May 2016 appointment, the facts show only appointments about Mr. Wilkerson's urological conditions with Dr. Chamberlain after May 2016. Similar to before, the facts don't show that Dr. Chamberlain was aware of the need for Mr. Wilkerson to be referred to the UIC wound clinic again.

### b. *Urological conditions*

For Dr. Chamberlain's treatment of the urological conditions, Mr. Wilkerson first argues that Dr. Chamberlain allowed months to pass after the September 2015 urology referral. Dkt. 328 at 23. The facts include, without further explanation, that Dr. Chamberlain made six entries in Mr. Wilkerson's medical chart from October 2015 to January 2016. *See* Dkt. 318 ¶ 52. The only appointment that the parties describe is on January 7, 2016, during which Dr. Chamberlain requested an

26

appointment with KSB because it was brought to his attention that Mr. Wilkerson still had no appointment at UIC. Dkt. 327 ¶ 36; Dkt. 308 ¶ 17. Dr. Chamberlain did what he could to get Mr. Wilkerson a urologist once he became aware that Mr. Wilkerson was still waiting, and there's no evidence to conclude that he was aware before January 7. No reasonable jury could find that Dr. Chamberlain was deliberately indifferent to Mr. Wilkerson's need for a urologist appointment.

Mr. Wilkerson next argues that he didn't receive another urology referral until May, but the facts indicate otherwise. After Mr. Wilkerson saw Dr. Mathew, Dr. Chamberlain saw Mr. Wilkerson to discuss Dr. Mathew's recommendations, during which he also referred Mr. Wilkerson to return to Dr. Mathew after the cystogram and CT scan that Dr. Mathew ordered. Dkt. 308 ¶ 20. And after those took place on February 29, 2016, Mr. Wilkerson saw Dr. Mathew on March 3, 2016. *Id.* ¶¶ 20-21; Dkt. 327 ¶ 38. Dr. Chamberlain was attentive to Mr. Wilkerson's medical needs and got him back to Dr. Mathew in a timely manner. It would be unreasonable to find Dr. Chamberlain deliberately indifferent for this conduct.

On May 25, 2016, Dr. Chamberlain approved Dr. Altman's referral to the UIC urology clinic. Dkt. 327 ¶ 41. There are only two mentions in the facts between March 3 and May 25 that involve Dr. Chamberlain. First, on March 9, 2016, Dr. Chamberlain approved Dr. Mathew's referral to the UIC wound care clinic. *Id.* ¶ 38. And second, he made an entry in Mr. Wilkerson's medical chart on March 17, 2016, but there is no further detail. Dkt. 318 ¶ 52. That leaves nothing to support that Dr.

Chamberlain would have known that Mr. Wilkerson needed another urology referral. *See Farmer*, 511 U.S. at 847; *Johnson*, 433 F.3d at 1010.

Mr. Wilkerson also argues that Dr. Chamberlain "allowed" a five-month delay after this referral. Dkt. 328 at 24-25. But the record doesn't show that Dr. Chamberlain was aware of the long delay; he made an entry in Mr. Wilkerson's medical chart the day after the referral was approved, but otherwise nothing in the facts suggests that Dr. Chamberlain saw Mr. Wilkerson until October 24, 2016—five days after the UIC urology appointment. Dkt. 318 ¶ 52; Dkt. 327 ¶ 43.

Finally, Mr. Wilkerson argues that Dr. Chamberlain failed to ensure the ultrasound and cystoscopy requested by the UIC urologist were scheduled. Dkt. 328 at 25. Dr. Chamberlain approved UIC Urology's recommendation a week after the appointment. Dkt. 327 ¶ 42. The next month, on November 23, 2016, Mr. Wilkerson had the ultrasound. Dkt. 308 ¶ 53. The ultrasound was four weeks after Dr. Chamberlain approved the request and two weeks after Dr. Chamberlain's last entry in Mr. Wilkerson's medical chart. *Id.*; Dkt. 318 ¶ 52; Dkt. 327 ¶ 42. Even by Mr. Wilkerson's expectation that the ultrasound should have happened within weeks, Dkt. 328 at 26,[5] no reasonable jury would find Dr. Chamberlain deliberately indifferent because of the timing of the ultrasound.

---

[5] Mr. Wilkerson relies on Dr. Abern's estimate for how long the wait would typically be. Dkt. 328 at 26. However, Dr. Abern's deposition testimony is about how quickly a cystoscopy would be performed, not "such procedures" more generally. *See id.*; Dkt. 341 ¶ 46. In addition, Dr. Abern testified that for a chronic condition like Mr. Wilkerson's, it could "easily be four to six weeks." Dkt. 341 ¶ 46.

After the ultrasound, Dr. Chamberlain saw Mr. Wilkerson only once before Mr. Wilkerson first went to UIC for a cystoscopy; on March 28, 2017, Dr. Chamberlain saw Mr. Wilkerson because of increased bladder spasms over the past two months and noted a possible UTI, and Mr. Wilkerson went to UIC eight days later. Dkt. 327 ¶¶ 44-45. Between November 2016 and March 2017, the record doesn't show that Dr. Chamberlain knew about the delayed cystoscopy. And soon after Dr. Chamberlain saw Mr. Wilkerson, Mr. Wilkerson was sent to UIC.[6] There is no reasonable finding of deliberate indifference.

## B. Wexford Health Services

The Seventh Circuit treats private entities acting under color of state law as municipalities. *Dean v. Wexford Health Services, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Because municipalities are not vicariously liable under § 1983, Wexford's liability is governed by *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Dean*, 18 F.4th at 235. Under *Monell*, a plaintiff must first show a deprivation of a federal right. *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022); *Stockton v. Milwaukee County*, 44 F.4th 605, 617 (7th Cir. 2022). The plaintiff must then connect that deprivation of a constitutional right to a municipal action in the form of "(1) an express policy, (2) a widespread practice or custom, or (3) action by one with final policy making authority." *Stockton*, 44 F.4th at 617. The plaintiff must also show that the municipal action amounts to deliberate

---

[6] Although it is unfortunate that the cystoscopy had to be further delayed because of Mr. Wilkerson's UTI, he doesn't attribute that delay to Dr. Chamberlain (or any of the other individuals). *See* Dkt. 328 at 25.

indifference and that the municipal action was the "moving force" behind the constitutional injury. *Id.*

Mr. Wilkerson argues that Wexford's customs and practices caused its medical providers to unjustifiably delay medical care. Dkt. 328 at 32. But Mr. Wilkerson has failed to show any underlying constitutional violation from the individual defendants; even if he could prove a widespread unconstitutional custom or practice, he cannot show causation. *See Pulera v. Sarzant*, 966 F.3d 540, 555 (7th Cir. 2020); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). Summary judgment must be granted as to the claim against Wexford.

## IV. Conclusion

Deliberate indifference under the Eighth Amendment poses a high bar for plaintiffs to clear; mere negligence or malpractice is not enough. Defendants' motions for summary judgment are granted. This case is dismissed with prejudice.

Date: March 25, 2024

Honorable Iain D. Johnston
United States District Judge